**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

RUBEN BELLO,                                Case No.: 22-cv-23005-DPG

          Plaintiff,

   vs.

DHL EXPRESS (USA), INC.,
A Florida Company,

          Defendant.

_____

**DHL'S MOTION FOR SUMMARY JUDGMENT
AND INCORPORATED MEMORANDUM OF LAW**

Defendant, DHL Express (USA), Inc. ("DHL"), pursuant to Federal Rule of Civil

Procedure 56, hereby moves for summary judgment against Plaintiff Ruben Bello ("Bello").

CLARKE SILVERGLATE, P.A.

## I.  Introduction

Final summary judgment for DHL is warranted—for so many reasons.

Plaintiff brought a three-count Complaint [D.E. 1] for interference and retaliation pursuant to the Family Medical Leave Act ("FMLA") and handicap discrimination under the Florida Civil Rights Act ("FCRA").  His alleged qualifying condition under the FMLA and his alleged handicap under the FCRA are the same—post-traumatic stress disorder ("PTSD") incurred because of a series of verbal disputes at work on June 24, 2020.  There is only one problem.  No credible medical practitioner applying widely-recognized authoritative treatises could credibly diagnose Plaintiff with PTSD—both based on the lack of a legitimate "trauma" and the lack of length of symptomology.  Plaintiff does not have and never had PTSD.  On this basis alone, his allegations fail and summary judgment is warranted on all counts.

Alternatively, now that all of Plaintiff's mistruths about his medical history and the June 24 incident have been unmasked, only one treater still believes he had PTSD—Dr. Priscilla Borrego from Banyan Health Systems ("Banyan").  Dr. Borrego diagnosed Plaintiff with PTSD on July 7, 2020, a week after he was fired.  As discussed above, Dr. Borrego's diagnosis is not credible and must be excluded.  Even if it is admissible, however, Plaintiff did not disclose Dr. Borrego as an expert nor provide an expert report as required by the rules of procedure.  Accordingly, Dr. Borrego at most can testify to her opinion of Plaintiff's condition on July 7, 2020.  She cannot opine about Plaintiff having PTSD at any time prior to her diagnosis.  Without a qualified witness supporting his medical position, Plaintiff cannot present evidence that he had PTSD at the time DHL terminated him.  On this alternative basis, summary judgment on all counts is warranted.

Finally, even if Plaintiff had PTSD, which he did not, he neither was "handicapped" nor had a qualifying "serious health condition" to trigger the application of the FMLA or FCRA. The workers' compensation nurse practitioner who originally diagnosed Plaintiff placed no restrictions on his ability to work. Plaintiff has similarly not alleged or proven how his alleged PTSD has limited a major life activity. Plaintiff was not handicapped or regarded as handicapped, nor did he have a serious health condition entitling him to leave. On this additional basis, summary judgment on all counts is warranted.

Finally, Plaintiff never applied for a leave of absence. By extension, he did not object to DHL's denial of a leave of absence. Having not engaged in protected activity, Plaintiff cannot state a *prima facie* case of FMLA retaliation. At minimum, summary judgment for DHL is warranted on Count II for FMLA retaliation.

## II.  Uncontroverted Facts Supporting Summary Judgment[1]

### A.    DHL and the TMB Station

DHL specializes in the rapid, secure transportation of time-sensitive documents and air freight globally. In compliance with federal and state law, DHL prohibits unlawful discrimination, harassment and retaliation on all protected classes, including disability, and has established effective policies and procedures for the promotion of a bias-free workplace.  DHL also has a fully compliant program for eligible employees to take necessary leave pursuant to the FMLA. DHL's third-party administrator Sedgwick manages DHL's FMLA policy.  (*Id*.).

---

[1] In compliance with Southern District of Florida Local Rule 56.1, DHL contemporaneously filed a Statement of Material Facts in numbered paragraphs attaching all supporting evidence. For ease of reading, DHL incorporates a substantial portion of its factual allegations here in narrative form.

DHL has multiple hubs in the United States, including Miami, where it operates a business unit in Doral known as the "TMB Station."  Most TMB Station employees are union members who are subject to a Collective Bargaining Agreement ("CBA") and a Local Rider.

### B.   Ruben Bello's Employment with DHL

Plaintiff began working for Airborne Express in 1998. In 2003, DHL acquired Airborne Express.  Upon DHL's acquisition of Airborne Express, Plaintiff became a DHL employee at the TMB Station. Plaintiff was a dockworker for DHL at the TMB Station from 2003 until July 1, 2020.   During his DHL employment, Plaintiff was a union member whose benefits and compensation were governed by the CBA and Local Rider.  During his DHL employment, Plaintiff never disclosed a disability nor did he request an accommodation.

During his DHL employment, Plaintiff displayed no signs of a disability and displayed no limitations in his ability to perform his work.  During his final year at DHL, Plaintiff worked a "split shift," meaning he worked both a morning and afternoon shift.  Because of his split shift, Plaintiff worked directly for multiple Shift Supervisors, but his assigned Supervisor was Alex Saumell.  During Plaintiff's final year at DHL, the TMB Station Manager was Greg Riggin.

### C.   Smoothie Incident on June 24, 2020.

The week of June 22, 2020 was "Employee Appreciation Week" at DHL.  On Wednesday the 24th, DHL arranged for the delivery of free smoothies to all the TMB Station employees.  Each employee was given a raffle-like ticket to turn in upon receipt of their smoothie to make sure each employee received one.

Saumell approached Plaintiff in the breakroom and asked for Plaintiff's ticket.   Plaintiff told Saumell that he did not have the ticket. After Saumell left the breakroom, Plaintiff was seen on video removing the ticket from his wallet, showing it to a co-worker while smiling, and putting

it back into his wallet. About three minutes later, Plaintiff removed the ticket from his wallet and hid it behind him under a stack of boxes while laughing with a co-worker. Less than one minute later, Saumell re-entered the breakroom and asked Plaintiff for the ticket again. Again, Plaintiff denied having the ticket. When Saumell exited the breakroom, Bello and his co-worker were seen laughing for several minutes. During all confrontations in the breakroom, there was no physical contact between Plaintiff and Saumell and there were multiple eyewitnesses present.

Following the break, video footage captured a second verbal exchange between Plaintiff and Saumell, clearly over Plaintiff's refusal to turn in the smoothie ticket.  The exchange lasts approximately ten seconds.  Again, several co-workers were present and, again, there was no physical contact between the two men.

Following the second interaction, Plaintiff approached his union shop steward, Keith Simons ("Simons"), and informed him of the verbal disputes.  Plaintiff and Simons approached Riggin and informed him of the verbal dispute with Saumell.  Plaintiff told Riggin that Saumell screamed at him and threatened to fire him because he was "unable to find" his smoothie ticket. He failed to disclose that he had the ticket the whole time.

The three men walked and talked and eventually were in another area captured on video. Saumell walked into the warehouse from another direction and crossed paths with the men. Saumell and Plaintiff had a brief exchange before Saumell turned around to walk away. Plaintiff then said something to Saumell, prompting him to walk toward him. Riggin stood between both men and escorted Saumell away, at which point the meeting ended. However, once again, there was no physical contact between Plaintiff and Saumell and there were eyewitnesses to the incident.

The disputes captured on video represent all the disputes between Plaintiff and Saumell on June 24, 2020.  During the exchanges, Plaintiff claims that Saumell told him that Plaintiff was

going to remember who Saumell was and threatened to fire him. Beyond the foregoing, Plaintiff has no recollection of the verbal exchanges between him and Saumell during the incident.

### D.    Plaintiff Files a Grievance and Requests to Seek Treatment

The final interaction between Bello and Saumell on June 24, 2020, occurred during the latter stages of Bello's morning shift.  Riggin left the facility shortly after the shift and found Plaintiff sitting in his car passing time between his shift.  Riggin asked if Plaintiff was ok, to which Plaintiff replied that he did not want to discuss the incidents further.

The following day, June 25, 2020, Plaintiff worked nearly his full shift without incident except for advising Riggin that he wanted to file a formal grievance through his union regarding Saumell's behavior.  Late in the shift, however, Plaintiff also reported anxiety and requested to visit Concentra, a local workers' compensation clinic.

Prior to leaving, Riggin had Plaintiff fill out a company form titled "Workplace Injury and Illness Statement."  On the form, Plaintiff described the incident:

> On June 24 in the morning, Alex Saumel[l] **attacked me violently** and threatened my integrity.  As a DHL employee now I am facing extreme anxiety and cannot focus on my work correctly.

### E.    Plaintiff Gets Treated at Concentra

After DHL received the Illness Statement, Shift Supervisor Argelio Gil drove Plaintiff to the clinic, but a representative advised that the clinic was closing and that Plaintiff should come the following morning.  On Friday, July 26, Plaintiff returned to Concentra where he treated with Certified Nurse Practitioner Joseph Penna.  CNP Penna is neither an Advanced Registered Nurse Practitioner ("ARNP") nor a Psychiatric Mental Health Advanced Registered Nurse Practitioner.

At the start of the visit, Plaintiff provided a history.  On Concentra's intake form he noted that, "On June 24 in the morning a violently attack occurred."  He also advised that he had no

history of any depression or mental illness and was not on any medications at the time.    CNP Penna prescribed a mild dose of an anti-depressive sleep aid and instructed Plaintiff to return on June 29 after the weekend.  He also called Greg Riggin at the TMB Station and explained that Plaintiff should take the rest of the 26th off pending his return visit.  Riggin agreed and designated it as paid time off ("PTO") for Plaintiff.

The same day, the 26th, Plaintiff came by the TMB Station and dropped off a "Work Activity Status Report" ("WASR") from Concentra which confirmed the prescribed medication and Plaintiff's follow-up appointment but included no diagnosis and no restrictions on Plaintiff's ability to work.  The WASR is the only document DHL receives discussing the treatment and impact on an employee's work status.  Plaintiff did not work weekends at the time and was therefore already off from work on June 27-28, 2020.

Plaintiff returned for his appointment on Monday, June 29th.  He again treated with CNP Penna.  During this appointment, five days after the verbal disputes, CNP Penna diagnosed Plaintiff with PTSD.  CNP Penna had never diagnosed anyone with PTSD in his career.  CNP Penna was not aware of the authoritative diagnostic criteria for PTSD.  CNP Penna prescribed no additional medication and again, in the WASR, noted no restrictions on Plaintiff's ability to work.

**F.    DHL Terminates Plaintiff After Riggin Investigates Further and Plaintiff Stops Showing Up For Work**

Over the week of June 29, Plaintiff never appeared for work.  He did not respond to Riggin's multiple calls, nor did he apply for a leave of absence.  DHL continued to apply Plaintiff's PTO.  Meanwhile, Riggin investigated Plaintiff's grievance.  He reviewed the three videos available.  He interviewed Saumell.  He interviewed every witness Plaintiff identified and every witness visible in the videos.  Riggin saw Plaintiff's behavior clearly in the video vis-à-vis the smoothie ticket.  He saw him double and triple down on his lies to Saumell about not having the

ticket.  He saw Plaintiff then pull the ticket out in front of the other dockworkers to show his prank and undermine his supervisor.   Riggin located the actual ticket where Plaintiff hid it in the breakroom.  Riggin also saw how nothing in all the interactions between Plaintiff and Saumell that could credibly be seen as a "violent attack."

Based on Plaintiff's compounded lies, including an accusation that could have jeopardized Saumell's career if video was not available to unmask its falsity, Riggin sought and received authorization to terminate Plaintiff on July 1, 2020.  Since Plaintiff had stopped showing up or returning calls, DHL notified Plaintiff of his termination via certified mail.

### G.      Plaintiff Continues Treatment

As was learned mid-litigation because Plaintiff willfully concealed it, Plaintiff has been treating for psychiatric illness since at least as far back as 2016.  He treated with Banyan, primarily under the care of psychiatrist Priscilla Borrego, M.D. ("Dr. Borrego").

On July 1, 2020, Plaintiff treated with Banyan's Advanced Registered Nurse Practitioner ("ARNP") Ruben Bembire.  Dr. Borrego knows ARNP Bembibre and described him as "very competent."  July 1 is the date DHL first mailed the termination letter to Plaintiff, so there is no basis to believe Plaintiff had received it by that time.  During the July 1 appointment, ARNP Bembibre performed a PHQ9 questionnaire, a test used to determine how depressed a patient is. In a PHQ9 questionnaire, the treater grades a patient between 0 and 3, 3 being the highest, on nine distinct symptoms of depression.  Symptoms includes energy level, ability to sleep, and feelings of hopelessness.  Because the nine symptoms are graded between 0 and 3, the minimum PHQ9 score is 0 and the maximum PHQ9 score is 27.  On July 1, 2020, seven days after a verbal dispute with Saumell, ARNP Bembibre assigned Plaintiff a PHQ9 score of **zero** out of 27.

Though he had been terminated, Plaintiff returned to Concentra for an appointment on July 6, 2020.  D.O. David San Miguel treated Plaintiff on this appointment.  Though his note includes CNP Penna's diagnosis of PTSD, Dr. San Miguel confirmed in deposition that he did not independently diagnose Plaintiff with PTSD.  Rather, he adopted the diagnosis from the June 29, 2020, visit.  Dr. San Miguel prescribed no limitations on Plaintiff's ability to work.  After 1) being advised of Plaintiff accurate psychiatric history (as opposed to the one presented to him on July 6, 2020); 2) reviewing the videos of the verbal altercations with Saumell; and 3) being reminded of the authoritative diagnostic criteria for PTSD, Dr. San Miguel confirmed that he would not diagnose Plaintiff with PTSD from the June 24, 2020, verbal altercations.

The following day, July 7, 2020, Plaintiff treated with Dr. Borrego.  Plaintiff told Dr. Borrego he had been terminated.  As part of her note, Dr. Borrego diagnosed Plaintiff with PTSD. July 7, 2020, was the first time Dr. Borrego ever diagnosed Plaintiff with PTSD.  She previously had diagnosed Plaintiff with a condition called schizoaffective disorder.

### H.    Plaintiff's Real History

Plaintiff has a lengthy history of psychiatric illness and treatment.  He at times has had prescriptions for 4-5 psychotropic drugs at a time.    During his 20-plus year history working for DHL, Plaintiff never disclosed that he was coping with mental illness.  His condition(s) never interfered with his ability to perform his job.  He never requested an accommodation.

Not only did Plaintiff not report any conditions, he willfully concealed them.  DHL's TMB dockworkers drive DHL commercial vehicles as part of their duties.  The dockworkers periodically report to Concentra for a "fitness to drive" assessment.  The assessment includes a current and past medical history, as well as the employee's certification that s/he is providing accurate information. Plaintiff underwent a "fitness to drive" examination on April 20, 2018.  On the exam, in response

to the question, "Do you have or have you ever had [] anxiety, depression, nervousness, [or] other mental health problems[?]", Plaintiff answered "No."  Similarly, the examination also asked Plaintiff if he currently was taking any medication and provided space to disclose and describe the medication.  Again, Plaintiff checked "No." While making these representations, Plaintiff was in fact under an active diagnosis of schizoaffective disorder, bipolar type, and prescribed with four different psychotropic medications.

Similarly, on June 26, 2020, during his first Concentra visit after the verbal dispute with Saumell, Plaintiff reported that he had no history of psychiatric illness.  Not only had he been treating for psychiatric illness for four years, he had an appointment just three days prior.  Plaintiff's false history prevented Concentra's treaters from accurately diagnosing his symptoms.

Even during litigation in response to DHL's interrogatories, Plaintiff gave a sworn response indicating that the only psychiatric treatment he had in his life was in 2020 due to the workplace incident with Saumell.  DHL only learned about Plaintiff's other treatment after subpoenaing Banyan, one of the companies Plaintiff identified as a 2020 treater.

Plaintiff performed his role without limitations and without seeking or needing an accommodation for 20+ years.  DHL at no time regarded Plaintiff as having a disability.  The only knowledge DHL ever had of Plaintiff undergoing psychiatric treatment while employed with DHL were the two WASR's it received from Concentra regarding treatment on June 26, 2020, and June 29, 2020, and the one phone call on June 26 from CNP Penna to Riggin.  From DHL's knowledge and perspective, the June 26 visit resulted in 1) a WASR that included no diagnosis and no work restrictions; and 2) telephonic advice from CNP Penna for Plaintiff to take the rest of June 26 off pending his return visit on Monday, June 29.  DHL followed that advice.

From DHL's knowledge and perspective, the June 29 visit resulted in a WASR that included a since-retracted diagnosis of PTSD but, again, no work restrictions.  The only doctor who still believes Plaintiff had PTSD at any point was Dr. Borrego.  She made her diagnosis on July 7, 2020, after Plaintiff already was terminated.

## I.      Plaintiff Files Charge of Discrimination

On April 23, 2021, Plaintiff purported to exhaust his administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  However, the Charge does not assert a claim for disability discrimination.  Plaintiff checks the box for "retaliation" and the "other" box, which he specifies as a claim for harassment.  In the narrative, Plaintiff describes that he was routinely subjected to harassment by his supervisor Alex Saumell for unspecified reasons and that he complained on numerous occasions to five different DHL managers about the ongoing harassment.  He claims he suffered from PTSD as a result of the harassment, and that he was fired in retaliation for requesting a leave of absence.  The Charge does not check the box for disability discrimination nor does it allege that he was fired for being disabled.

## III.  Summary Judgment Standard

Pursuant to Rule 56(a), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has carried its burden, the non-moving party must show the existence of a genuine issue of material fact to avoid summary judgment. *Id.*

### IV.  Legal Discussion

Plaintiff asserts three claims.  In Count I, under the FMLA, Plaintiff asserts that he developed PTSD from his June 26, 2020, confrontations with Saumell, and that due to his PTSD, he needed to take leave under the FMLA.  He claims DHL interfered with his FMLA rights by terminating him.  In Count II, also under the FMLA, Plaintiff asserts that he requested FMLA leave due to his PTSD.  He alleges that DHL terminated him in retaliation for requesting leave.  In Count III, under the FCRA, Plaintiff alleges that he was disabled as a result of his PTSD.  He alleges further that DHL's termination of him constituted disability discrimination.

As discussed below, summary judgment is warranted on each of Plaintiff's claims.

### A.      Plaintiff Did Not Have PTSD

An element common to all of Plaintiff's allegations is that he developed PTSD from his verbal disputes with Saumell on June 24, 2020.  As discussed at great length in DHL's contemporaneously filed Motion to Exclude Testimony of Treating Physician Dr. Priscilla Borrego as to Her Opinion and Diagnosis that Plaintiff Suffers or Has Suffered from Post-Traumatic Stress Disorder ("*Daubert* Motion"), Plaintiff does not suffer from and has never suffered from PTSD.[2] PTSD is a rare mental health condition reserved for those who have experienced a catastrophic stressor outside the range of human experience and subsequently experienced severe symptoms for at least thirty days.  "Catastrophic stressors" generally refer to war, torture, rape, severe automobile accidents, etc.  It does not refer to an argument with your boss which includes no physical altercation.

Moreover, DHL terminated Plaintiff for repetitive lying on July 1, 2020, only seven days after the verbal disputes with Saumell.  Clinically, Plaintiff could not have developed PTSD before

---

[2] DHL incorporates herein its Motion to Exclude . . . Dr. Borrego's opinion.

his termination because, pursuant to authoritative treatises, PTSD requires 30 days of symptoms. Not only was there insufficient time to develop PTSD, Plaintiff displayed no symptoms on July 1, 2020, during his visit with ARNP Bembibre.

Each of Plaintiff's claims relies on his allegation that he had PTSD. He did not have PTSD. Summary judgment is therefore warranted on all claims.

> **B.     Regardless of Whether the Court Excludes Dr. Borrego's Opinion that Plaintiff Had PTSD, Plaintiff Has No Witness Who Can Testify that He Had PTSD at or Before the Time DHL Terminated Him.**

Plaintiff has the burden of proving he had PTSD at the time he was fired. A competent witness must support this allegation. Plaintiff cannot medically diagnose himself. *See GEICO v. Seco*, 2022 WL 17551449, *3 (S.D. Fla. Dec. 8, 2022) ("Medical diagnoses and medical causation opinions ordinarily present technical and scientific issues that require the specialized knowledge of an expert witness"); *Nguyen v. Chater*, 100 F. 3d 1462, 1467 (9th Cir. 1996) (While a lay witness can testify to his symptoms, "medical diagnoses are beyond the competence of lay witnesses and therefore do not constitute competent evidence.").

CNP Penna originally diagnosed Plaintiff with PTSD on June 26, 2020. However, several relevant events caused CNP Penna to retract his diagnosis. One, CNP Penna confirmed that he based his diagnosis in part on the false history Plaintiff provided—in other words, he believed he was treating someone with no psychiatric history rather than a patient with an active diagnosis of schizoaffective disorder. Two, at his deposition CNP Penna reviewed the workplace videos for the first time and realized no trauma occurred. Third, CNP Penna confirmed that he was unaware of the correct diagnostic criteria for PTSD, including that someone cannot have PTSD two days after a trauma. CNP Penna does not support Plaintiff's claim that he had PTSD.

Similarly, Dr. San Miguel, who did not treat Plaintiff until July 6, 2020, confirmed that he did not diagnose Plaintiff with PTSD.  After reviewing the workplace videos and being reminded of the authoritative diagnostic criteria for PTSD, Dr. San Miguel confirmed that he would not diagnose Plaintiff with PTSD.  Dr. San Miguel does not support Plaintiff's claim that he had PTSD.

Dr. Borrego is the only treater who still believes Plaintiff had PTSD.  However, she cannot testify that Plaintiff had PTSD prior to his termination from DHL for several reasons.  One, as discussed in the *Daubert* Motion, the Court should exclude this invalid opinion pursuant to its gatekeeping function to Federal Rule of Civil Procedure 702.  Two, even if Dr. Borrego is permitted to testify about her PTSD diagnosis, she made it on July 7, 2020, after DHL terminated Plaintiff.  Plaintiff has not identified Dr. Borrego as an expert or a rebuttal expert.  Plaintiff has not provided a report from Dr. Borrego pursuant to Federal Rule of Civil Procedure 26(a)(2) listing her opinions and her bases for same.  Accordingly, Dr. Borrego can testify to her treatment and her diagnosis, but cannot offer an opinion beyond her treatment, such as an opinion that Plaintiff had PTSD prior to the day she diagnosed him.     *Worley v. Carnival Corp.*, 2023 WL 1840107, *7-8 (S.D. Fla. Jan. 27, 2023) (Absent compliance with disclosure requirements, treating physicians limited to testifying to facts observed during treatment); *see also Kessler v. NCL (Bahamas) Ltd.*, 2020 WL 10459594, *1 (S.D. Fla. Sep. 30, 2020) (absent proper disclosure including a report, treating physicians may testify only as to what they observe during the course of their treatment; they may not venture into testimony of an expert nature) (J. Gayles); *see also Torres v. Walmart Stores East, L.P.*, 2017 WL 8780915, *2 (S.D. Fla. Jun. 9, 2017).

Dr. Borrego should not be permitted to testify that Plaintiff had PTSD at any time because her methodology is woefully flawed.  However, even if the Court disagrees, her opinion must be confined to her treatment on July 7, 2020, because she did not provide a report substantiating

expert opinions.  She cannot testify to Plaintiff's condition prior to his termination, nor can she testify to her disagreement with ARNP Bembibre's July 1, 2020, PHQ9 findings when she was not present for the examination.

Based on the foregoing, Plaintiff has no witness who can support his claim that he had PTSD when DHL terminated him.  This fact is fatal to each of his claims.

**C.     Even if He Had PTSD, Which He Did Not, Plaintiff was Never Incapacitated as Required for FMLA Eligibility.**

The Court need not proceed any further.  All three of Plaintiff's claims are based on a false allegation that he had PTSD.  If he did not have PTSD, his claims fail as a matter of law.

However, even if Plaintiff had PTSD, he did not have a qualifying disability entitling him to FMLA leave.  To receive FMLA protections, "one must be both eligible, meaning having worked the requisite hours, and entitled to leave, meaning an employee has experienced a triggering event" such as a "serious health condition" causing the employee to be unable to perform his job. *Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012); *see also* 29 C.F.R. § 825.112(a)(4). This threshold issue is settled in the Eleventh Circuit:

> We need not decide which of those two legal theories [interference or retaliation] Russell pursued in the district court, because it does not matter. Interference and retaliation claims both require the employee to establish a "serious health condition," and as we will explain, Russell has failed to do that. As a result, she has not established her entitlement to a benefit even under the more employee-friendly interference theory.

*Russell v. North Broward Hosp.*, 346 F. 3d 1335, 1340 (11th Cir. 2003) (emphasis added); *see also* *Martin v. Financial Asset Mgmt. Sys., Inc.*, 959 F. 3d 1048, 1052-53 (11th Cir. 2020) (rejecting the argument that "the FMLA protects a request for FMLA leave regardless of whether the employee would be eligible for leave," and holding that to state a claim for interference or retaliation, the plaintiff had to be eligible for the leave sought, which meant showing that she

suffered from a serious health condition); *Hurley v. Kent of Naples, Inc.*, 746 F. 3d 1161, 1167 (11th Cir. 2014); *Garcia v. Delta Air Lines*, 2019 WL 659424, at *3 (S.D. Fla. 2019); *Tijerino v. Public Health Trust of Miami-Dade Cty.*, 2019 WL 4749845, at *4 (S.D. Fla., Aug. 26, 2019).

Bello did not have a qualifying medical condition entitling him to take FMLA leave.

To qualify for FMLA eligibility based on one's own illness or injury, an employee must have a statutorily qualified "serious health condition." *See* 29 CFR § 825.112(4). A serious health condition must either involve "inpatient care" or require "continuing treatment" as defined in 29 CFR § 825.115. *See* 29 CFR § 825.113(a). There is no dispute that, at the time DHL terminated Plaintiff, he had not treated through inpatient care. In the absence of inpatient treatment, an employee must meet one of the six criteria under 29 CFR § 825.115. Each of the six potential criteria require "incapacity," a term defined as "**inability to work**, attend school or perform other regular daily activities **due to the serious health condition**, treatment therefore, or recovery therefrom." 29 CFR § 825.113 (b) (emphasis added).

Between the June 24, 2020, verbal dispute and DHL's termination decision on July 1, 2020, Plaintiff visited Concentra twice—on June 26 and June 29. DHL received a one-page WASR for each visit. Neither WASR included any restriction on Plaintiff's ability to work. By definition, Plaintiff was not "incapacitated." Moreover, the June 26 WASR did not ascribe a condition to Plaintiff. June 26 was a Friday. CNP Penna prescribed a mild dose of an anti-depressant and asked to see him again the following Monday. Plaintiff was off Saturday and Sunday, and returned for his follow-up visit on Monday the 29th. At the follow-up appointment, CNP Penna diagnosed Plaintiff with PTSD (which he has since retracted), but did not prescribe him any medication or place any work restrictions on him. In the absence of inpatient care or incapacity as defined by

the FMLA, Plaintiff cannot establish that he was entitled to FMLA leave.  DHL is therefore entitled to final summary judgment as to Counts I and II.

**D.      Count II is Further Barred Because Plaintiff Did Not Engage in Protected Activity.**

Count II is for FMLA retaliation.  As discussed above, summary judgment is warranted because, under Eleventh Circuit precedent, Plaintiff cannot assert an FMLA retaliation claim without a qualifying "serious health condition." *Russell*, 346 F. 3d at 1340; *Martin*, 959 F. 3d at 1052; *Hurley*, 746 F. 3d at 1167; *Garcia*, 2019 WL 659424 at *3; *Tijerino*, 2019 WL 4749845 at *4.  Count II first fails because Plaintiff did not have PTSD.  Count II alternatively fails because even if Plaintiff had PTSD, he was not sufficiently incapacitated for his PTSD to qualify as a "serious health condition" under the FMLA.

Count II suffers yet another fatal blow, however.  To establish a *prima facie* of retaliation, an FMLA plaintiff must show 1) he engaged in a statutory protected activity; 2) he suffered an adverse employment decision; and 3) the decision was causally related to the protected activity. *Hyde v. K.B. Home, Inc.*, 355 Fed. Appx. 266, 272-73 (11th Cir. 2009);  *Wills v. Walmart Associates, Inc.*, 592 F. Supp. 3d 1203, 1233 (S.D. Fla. 2022).   Plaintiff cannot satisfy the first prong of a *prima facie* case.  "Protected activity" under the FMLA means opposing a practice that is allegedly unlawful under the Act. *See Walker v. Elmore Cty. Bd. of Educ.*, 379 F. 3d 1249, 1253 (11th Cir. 2004); *Ramos v. University of Miami*, 2021 WL 4949160, *2-3 (S.D. Fla. Oct. 2021); *Barreto v. WGCC, Inc.*, 2007 WL 9702904, *3 (S.D. Fla. Jan. 8, 2007).

The issue of FMLA leave never arose during Plaintiff's employment.  On Friday, June 26, 2020, he dropped off a WASR that included no diagnosis, a mild prescription, and no work restrictions.  Plaintiff did not request any leave.  On Monday, June 29, 2020, he dropped off another WASR that included a diagnosis, no medication prescription, and no work restrictions.  Plaintiff

did not request any leave.  From June 29, 2020 through the July 1, 2020 termination, Plaintiff did not show for work.  He did not answer Riggin's phone calls.  He did not return Riggin's phone calls.  He did not request leave.

With Plaintiff having never sought leave, DHL never granted or denied such a request.  By extension, there was no denial for Plaintiff to protest.  He did not engage in protected activity, and summary judgment on Count II is proper on this additional ground.

### E.       Summary Judgment is Warranted on Bello's Handicap Discrimination Claim.

Count III is for handicap discrimination under the Florida Civil Rights Act, Fla. § 760.10, *et seq.* ("FCRA").  To establish a *prima facie* case of handicap discrimination under the FCRA, the employee bears the burden of proving he "(1) has or is perceived to have a "disability"; (2) is a "qualified" individual; and (3) was discriminated against because of the disability." *Goldsmith v. Jackson Memorial Hosp. Public Health Trust,* 33 F. Supp. 2d 1336 (S.D. Fla. 1998).  As with Counts I-II, Plaintiff's alleged disability is that he had PTSD as a result of his verbal disputes with Shift Supervisor Alex Saumell on June 24, 2020.

### 1.       Plaintiff did not have PTSD.

As discussed throughout this Motion and in DHL's companion *Daubert* Motion, Plaintiff does not have and never has had PTSD.  Alternatively, the only physician who believes Plaintiff had PTSD, Dr. Borrego, did not diagnose him until after DHL terminated him.  Because she is not disclosed as an expert, she cannot testify that Plaintiff had PTSD prior to her July 7, 2020, treatment date.  On this basis alone, he cannot state a *prima facie* case of disability discrimination.  Summary judgment should be entered as to Count III and the Court need not proceed any further.

2.      Even if Plaintiff had PTSD, DHL had no knowledge he was disabled.

Plaintiff did not have PTSD, and the Court need not proceed any further because Plaintiff cannot meet the first prong of a *prima facie* case.  However, even if he had PTSD, he cannot meet the third prong of a *prima facie* case because DHL had no knowledge that he was disabled.  *See Williams v. School Bd. of Pinellas Cty., Florida*, 2023 WL 2810731, *3 (M.D. Fla. Apr. 6, 2023) ("where a plaintiff cannot show 'that his employer had actual or constructive knowledge of his disability,' the plaintiff cannot 'sustain a case of handicap discrimination.'"); *see also Kuczynski v. Lyra Management, Inc.*, 2010 WL 326060, *3 (S.D. Fla. Jan. 21, 2010) (citing several cases for the proposition that an employer's knowledge of an employee's disability is an essential element to prove that the employer discriminated against the employee because of the disability).

A medical condition alone is not a disability.  Handicap discrimination claims under the FCRA are analyzed using the same framework as federal Americans with Disabilities Act ("ADA") claims.  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Under the ADA, a disability is defined as: "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2).  The Equal Employment Opportunity Commission's ("EEOC") regulations explain that major life activities are functions such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. §1630.2(i). An impairment "substantially limits" a major life activity when the individual is substantially limited from performing a "major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).  Importantly, however, if a limitation on a major life activity is corrected

by medication or other measures, the patient is not disabled. *See Corning v. LodgeNet Interactive Corp.*, 896 F. Supp. 2d 1138, 1146 (M.D. Fla. 2012); *Meisenhelder v. Florida Coastal School of Law, Inc.*, 2010 WL 2028089, *3 (M.D. Fla. 2010).

The uncontroverted facts are (1) Plaintiff never disclosed any psychiatric conditions to DHL prior to June 26, 2020; and (2) the WASR's provided to DHL do not list any limitations on Plaintiff's ability to work or any other impact on any of Plaintiff's major life functions; and (3) Plaintiff never reported any inability to work or any limitations on one of this major life functions. For twenty-plus years, he showed every ability to perform his job without an accommodation. Without any knowledge that Plaintiff was disabled, DHL could not have fired him because of a disability. Indeed, DHL fired him for a series of lies—first to his direct supervisor when he kept falsely insisting he did not have the "smoothie ticket" and then to the station manager when he lied about being "violently attacked."

        3.    <u>Plaintiff did not exhaust his administrative remedies as to a handicap discrimination claim.</u>

To bring suit for discrimination under the FCRA, a plaintiff first must exhaust administrative remedies by timely filing a charge of discrimination with the appropriate commission. *See Francois v. Miami Dade Cnty.*, 432 Fed. Appx. 819, 821 (11th Cir. 2011); *Weatherly v. ABC Legal, Inc.*, 2023 WL 2701574, *5 (S.D. Fla. March 10, 2023) (Gayles, J.). If a claim not administratively exhausted is brought as part of a subsequent lawsuit, the proper inquiry is whether a claim is like or related to, or grows out of the allegations contained in the administrative charge. *Gregory v. Ga. Dep't of Hum. Res.*, 355 F. 3d 1277, 1279-80 (11th Cir. 2004); *Weatherly*, 2023 WL 2701574 at *5.

In *Weatherly*, this Court granted summary judgment on a national origin claim for failure to exhaust administrative remedies. *Id.* at *5. In the charge, the plaintiff checked the boxes for

race discrimination and retaliation.  *Id*. at \*4.  The plaintiff did not check the national origin box and only mentioned that Plaintiff was "a white woman of Russian descent."  *Id*. at \*5.  The Court found this lone reference insufficient to put defendant on notice of a potential national origin discrimination claim.

Similarly, in this case Count III alleges that DHL terminated Plaintiff because he had PTSD.  The charge of discrimination alleges no such thing.  Plaintiff checked the boxes for retaliation and harassment; he did not check the disability box.  The narrative claims that Saumell chronically harassed Plaintiff on unspecified grounds to the point where Plaintiff developed PTSD.  The narrative then alleges that Plaintiff's treaters instructed him to take time off and, when he requested the time, DHL fired him in retaliation for attempting to take leave.  The charge in no way alleges that DHL fired Plaintiff due to an animus against people with PTSD or disabled people in general.  Plaintiff failed to exhaust administrative remedies as to a handicap/disability discrimination claim.

On these alternative bases, summary judgment is warranted as to Count III.

### V.  Conclusion

Based on the foregoing, summary judgment for DHL on all counts is warranted.

Respectfully submitted,

**CLARKE SILVERGLATE, P.A.**
5301 Blue Lagoon Drive, Suite 900
Miami, FL 33126
Telephone: (305) 377-0700
Facsimile:  (305) 377-3001

By: */s/ Craig Salner*
      Craig Salner
      Florida Bar No. 669695
      csalner@cspalaw.com
      smunguia@cspalaw.com
      socd@cspalaw.com

Case No.: 22-cv-23005-DPG

Maria J. Londono, Esq.
Florida Bar No. 1011034
mlondono@cspalaw.com
jsantana@cspalaw.com

*Counsel for Defendant DHL Express (USA), Inc.*

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on July 7, 2023, with the Clerk of Court using the CM/ECF system, which will send e-filing notices to all counsel of record identified below:e

Henry Hernandez, Esq.
Florida Bar No. 542601
henry@hhlawflorida.com
GARCIA HERNANDEZ, P.A.
2655 S. LeJeune Road, Suite 802
Coral Gables, Florida 33134
T: (305) 771-3374

*Co-Counsel for Plaintiff*

Monica Espino, Esq.
Florida Bar No. 834491
me@espino-law.com
Espino Law, PL
2250 SW 3rd Ave, Ste. 400
Miami, FL 33129
T: (305) 704-3172

*Co-Counsel for Plaintiff*

CLARKE SILVERGLATE, P.A.

By: */s/ Craig Salner*
      Craig Salner