**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

RUBEN BELLO,

    Plaintiff,

vs.

DHL EXPRESS (USA), INC.,
A Florida Company,

    Defendant.

Case No.: 22-cv-23005-DPG

**MOTION TO EXCLUDE TESTIMONY OF TREATING PHYSICIAN DR. PRISCILLA BORREGO AS TO HER OPINION AND DIAGNOSIS THAT PLAINTIFF SUFFERS OR HAS SUFFERED FROM POST-TRAUMATIC STRESS DISORDER**

Defendant, DHL Express (USA), Inc. ("DHL"), pursuant to Federal Rule of Civil Procedure 26(a)(2) and Federal Rule of Evidence 702, hereby moves to exclude the testimony of Plaintiff's treating physician Dr. Priscilla Borrego as to her opinion and diagnosis that Plaintiff suffers or has suffered from post-traumatic stress disorder ("PTSD").

**I. Introduction**

Plaintiff alleges he developed PTSD after a series of workplace verbal encounters with his supervisor Alex Saumell ("Saumell") on June 24, 2020. He further alleges that DHL unlawfully terminated him a week later, discriminating against him for his newly developed "disability" and interfering with his Family Medical Leave Act ("FMLA") rights.

Dr. Borrego is the only treater who still believes Plaintiff incurred PTSD from the verbal incidents. She diagnosed Plaintiff with PTSD on July 7, 2020, 13 days later and six days following his termination. She has not been disclosed as an expert (or rebuttal expert) in this case, nor has she provided a report supporting her opinions. Her opinion runs afoul of authoritative criteria for

the diagnosis of PTSD in numerous respects. The verbal events, all captured on video, were not sufficiently traumatic to trigger a potential case of PTSD. Moreover, Plaintiff's symptomology was not lengthy enough to qualify as PTSD.

Pursuant to Federal Rule of Evidence 702(c, d), the Court should exclude Dr. Borrego's opinion that Plaintiff suffered from PTSD. Alternatively, at minimum, since Plaintiff has not identified Dr. Borrego as an expert nor furnished a report of her opinions and bases, Dr. Borrego should be limited to testifying about her treatment and diagnoses—namely, that Plaintiff presented with PTSD for the first time on July 7, 2020, after he already had been terminated from DHL.

## II. Background

### A. The Case

Plaintiff brought a three-count Complaint [D.E. 1] arising from his July 1, 2020, termination from DHL. He claims that his termination interfered with his FMLA rights (of which he had none), was in retaliation for requesting FMLA leave (which he did not) and was unlawfully based on his PTSD (which he did not have nor did DHL perceive him to have).

### B. The Key Facts[1]

1. The "Smoothie Incident"

Plaintiff was a long-time union dockworker at DHL's "TMB Station" in Doral. The week of June 22, 2020, was "Employee Appreciation Week" at DHL. On Wednesday the 24th, DHL arranged for the delivery of free smoothies to all the TMB Station employees. Each employee was given a raffle-like ticket to turn in upon receipt of their smoothie to make sure each employee received one.

---

[1] This is a more abbreviated version of the key facts. DHL contemporaneously is filing a Motion for Summary Final Judgment with a full Statement of Undisputed Facts with supporting evidence attached in compliance with the Southern District of Florida's Local Rules.

For reasons unknown, Plaintiff played an insubordinate prank on his direct supervisor, Alex Saumell. Rather than turn in his ticket, Plaintiff told Saumell that he did not have it. A closed circuit video of the TMB Station's breakroom shows Saumell repeatedly demanding the ticket from Plaintiff in front of several other employees. Plaintiff continuously gestured that he did not have it, at one point turning his pockets inside out. There was no physical contact between the two men. As soon as Saumell left the room, Plaintiff showed his co-workers that he had the ticket in his wallet. He laughed and spoke to his co-workers, who laughed in response to Plaintiff's comments. Plaintiff later removed the ticket from his wallet and attempted to hide it between some boxes stacked in the breakroom.

Following the break, video footage captured a second verbal interaction between Plaintiff and Saumell, lasting about ten seconds, clearly over Plaintiff's refusal to turn in the smoothie ticket. Again, several co-workers were present and, again, there was no physical contact between the two men.

Remarkably, Plaintiff, the man who created the incident with his insubordination, escalated matters. He approached his union shop steward Keith Simons to report Saumell for his alleged "verbal abuse." The two men engaged Station Manager Greg Riggin and informed him of Saumell's behavior. Unsurprisingly, they neglected to mention Plaintiff's 100% responsibility for starting the dispute. Video captured the three men conferring. During the conversation, Saumell walked by the men in the ordinary course of his work. Plaintiff and Saumell had another brief exchange before Saumell started to walk away. Plaintiff said something to Saumell which prompted Saumell to walk back toward Plaintiff. Riggin immediately stood between the two men and escorted Saumell away from the scene. Again, several co-workers present and, again, no physical contact between the two men.

2.  Plaintiff Files a Grievance and Requests to Seek Treatment

At this time, Plaintiff worked a "split shift" at the TMB station, meaning he worked a morning shift, often under Saumell's supervision, and an evening shift under another supervisor's direction. On June 24, the final verbal encounter occurred shortly before the end of Plaintiff's first shift. Riggin left the facility shortly after the shift and found Plaintiff sitting in his car passing time between shifts. Riggin asked if Plaintiff was ok, to which Plaintiff replied that he did not want to discuss the incidents further.

The following day, Plaintiff worked but advised Riggin that he wanted to file a formal grievance through his union regarding Saumell's behavior the prior day. Also, late in the shift, he reported anxiety and requested to visit Concentra, a local workers' compensation clinic. Prior to leaving, Riggin had Plaintiff fill out a form titled "Workplace Injury and Illness Statement." On the form, Plaintiff described the incident:

> On June 24 in the morning, Alex Saumel[l] **attacked me violently** and threatened my integrity. As a DHL employee now I am facing extreme anxiety and cannot focus on my work correctly.

Some stunning representations. After pure verbal disputes, all with multiple witnesses and none with any physical contact, Plaintiff represented to the Station Manager that Saumell "violently attacked" him. Moreover, though he instigated the dispute with repeated lies about not having the smoothie ticket, he feigned sensitivity to any negative reflections on his "integrity."

3.  Plaintiff Gets Treated at Concentra

After DHL received the Illness Statement, Shift Supervisor Argelio Gil drove Plaintiff to the clinic, but a clinic representative advised that the clinic was closing and that Plaintiff should come back the following morning. On Friday, July 26, Plaintiff returned to Concentra first thing in the morning, where he treated with Certified Nurse Practitioner Joseph Penna. CNP Penna is

neither an Advanced Registered Nurse Practitioner ("ARNP") nor a Psychiatric Mental Health Advanced Registered Nurse Practitioner ("PMH-ARNP"). At the start of the visit, Plaintiff provided a history. On Concentra's intake form he noted that, "On June 24 in the morning a violently attack occurred." Notably, he also advised that he had no history of any depression or mental illness and was not on any medications at the time.

CNP Penna prescribed a mild dose of an anti-depressive sleep aid and instructed Plaintiff to return on June 29 after the weekend. He also called Greg Riggin at the TMB Station and explained that Plaintiff should take the rest of the 26th off pending his return visit. Riggin agreed and designated it as paid time off ("PTO") for Plaintiff. Plaintiff came by the TMB Station and dropped off a "Work Activity Status Report" ("WASR") from Concentra which confirmed the prescribed medication and Plaintiff's follow-up appointment but included no restrictions on Plaintiff's ability to work. The WASR is the only document DHL receives discussing the treatment and impact on an employee's work status. Plaintiff did not work weekends at the time and was therefore already off from work on June 27-28, 2020.

Plaintiff returned for his appointment on Monday, June 29th. During this appointment, five days after the verbal incidents with Saumell, CNP Penna diagnosed Plaintiff with PTSD. He had never diagnosed an individual with PTSD in his career and, in deposition, could barely describe the condition with greater depth than a layperson. He prescribed no additional medication and again, in the WASR, noted no restrictions on Plaintiff's ability to work.

    4.    DHL Terminates Plaintiff After Riggin Investigates Further and Plaintiff Stops Showing Up

Over the week of June 29, Plaintiff never appeared for work. He did not respond to Riggin's multiple calls, nor did he apply for a leave of absence. DHL continued to apply Plaintiff's PTO. Meanwhile, Riggin investigated Plaintiff's grievance. He reviewed the three videos

available. He interviewed Saumell. He interviewed every witness Plaintiff identified in his grievance and every witness visible in the videos. He saw Plaintiff's behavior clearly in the video vis-à-vis the ticket. He saw him double and triple down on his lies to Saumell about not having the ticket. Riggin saw him then pull the ticket out in front of the other dockworkers to show his prank and undermine the workers' supervisor. Riggin located the actual ticket where Plaintiff hid it in the breakroom. Riggin also saw nothing in all the interactions between Plaintiff and Saumell that credibly could be seen as a "violent attack."

Based on Plaintiff's compounded lies, including an accusation which could have jeopardized Saumell's career if ample video was not available to expose its falsity, Riggin sought and received authorization to terminate Plaintiff on July 1, 2020. Since Plaintiff had stopped showing up or returning calls, DHL notified Plaintiff of his termination via certified mail.

5. Plaintiff Continues Treatment

As was learned mid-litigation because Plaintiff willfully concealed it, Plaintiff has been treating for psychiatric illness since at least as far back as 2016. He treated with Banyan, primarily under the care of psychiatrist Priscilla Borrego, M.D. ("Dr. Borrego").

On July 1, 2020, Plaintiff treated with Banyan's Advanced Registered Nurse Practitioner ("ARNP") Ruben Bembire. Dr. Borrego knows ARNP Bembibre and described him as "very competent." July 1 is the date DHL first mailed the termination letter to Plaintiff, so there is no basis to believe Plaintiff had received it by that time. During the July 1 appointment, ARNP Bembibre performed a PHQ9 questionnaire, a test used to determine how depressed a patient is. In a PHQ9 questionnaire, the treater grades a patient between 0 and 3, 3 being the highest, on nine distinct symptoms of depression. Symptoms includes energy level, ability to sleep, and feelings of hopelessness. Because the nine symptoms are graded between 0 and 3, the minimum PHQ9

score is 0 and the maximum PHQ9 score is 27. On July 1, 2020, seven days after a verbal dispute with Saumell, ARNP Bembibre assigned Plaintiff a PHQ9 score of **zero** out of 27.

Though he had been terminated, Plaintiff returned to Concentra for an appointment on July 6, 2020. D.O. David San Miguel treated Plaintiff on this appointment. Though his note includes CNP Penna's diagnosis of PTSD, Dr. San Miguel confirmed in deposition that he did not independently diagnose Plaintiff with PTSD. Rather, he adopted the diagnosis from the June 29, 2020, visit. Dr. San Miguel prescribed no limitations on Plaintiff's ability to work. After 1) being advised of Plaintiff accurate psychiatric history for the first time; 2) reviewing the videos of the verbal incidents with Saumell; and 3) being reminded of the authoritative diagnostic criteria for PTSD, Dr. San Miguel confirmed that he would not diagnose Plaintiff with PTSD from the June 24, 2020, interactions.

The following day, July 7, 2020, Plaintiff treated with Dr. Borrego. Plaintiff told Dr. Borrego he had been terminated. As part of her note, Dr. Borrego diagnosed Plaintiff with PTSD. July 7, 2020, was the first time Dr. Borrego ever diagnosed Plaintiff with PTSD. She previously had diagnosed Plaintiff with a condition called schizoaffective disorder.

### C. PTSD

#### 1. What is PTSD

PTSD was originally conceived in terms of a catastrophic stressor that was outside the range of normal human experience. (Singer Decl. ¶ 4) (Ex. A). The original PTSD diagnosis was meant to be used for war, torture, rape, catastrophic human events (the Holocaust, atomic bombings) and catastrophes outside the normal human experience (airplane crashes, automobile accidents). (*Id*.). The essential feature of PTSD is the development of characteristic symptoms

for a certain duration of time following exposure to an extreme traumatic event as defined by the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* ("DSM-V").[2] (*Id.* ¶ 5).

PTSD is defined in detail in the Trauma and Stressor Related Disorders Section of the DSM-V. (*Id.*). This section of psychiatric diagnoses is different from all other psychiatric disorders in that the diagnosis requires, as a precondition, a well-defined stressor to be eligible for the diagnosis (rather than just symptoms). (*Id.*). PTSD also requires a duration of symptoms (30 days). (*Id.*).

To meet the criteria for PTSD, one requires 1) a medically significant trauma; 2) requisite symptoms sufficient in number and severity; and 3) 30 days of such symptomology. (*Id.* ¶ 6). Trauma is objectively defined in the DSM-V, meaning an individual's subjective interpretation of an event is insufficient if the event is not objectively severe enough. (*Id.*). Exposure to trauma—as defined in the DSM-V—is the absolute foundation and necessary prerequisite for the diagnosis of PTSD. (*Id.*).

With the evolving iterations of the DSM-V, the criteria for PTSD has become more restrictive. (*Id.* ¶ 7). Not all emotionally traumatic incidents are sufficient to meet the criteria for diagnosis and, in fact, most emotionally traumatic events do not meet the definition of what is required. (*Id.*). The DSM-V definition of trauma necessary to meet the criteria for potential PTSD requires exposure to "actual or threatened death, serious injury, or sexual violence." (*Id.*). Stressful events not involving an immediate threat to life or physical injury are not considered trauma in this definition. (*Id.*). The directly experienced traumatic events sufficient for potential PTSD include exposure to war as a combatant or civilian, actual or threatened physical assault in

---

[2] All of Plaintiff's relevant treaters in this case acknowledge that the DSM-V is authoritative in the field of psychiatric medicine. *See* Borrego Dep. at pp. 10-11; *see* Penna Dep. at pp. 11-12; *see* San Miguel Dep. at p. 10 (Comp. Ex. B).

which the threat is perceived as imminent and realistic (e.g., physical attack, robbery, mugging, childhood physical abuse), being kidnapped, being taken hostage, a terrorist attack, torture, incarceration as a prisoner of war, natural or human-made disasters, and severe vehicular accidents. (*Id*. ¶ 8). There must be a credible and immediate threat of serious harm or sexual violence. (*Id*.).

As an example, medically-based trauma is now limited to sudden catastrophic events such as debridement of a burn, waking during surgery, emergency cardioversion, or anaphylaxis. (*Id*. ¶ 9). Coping with terminal cancer or experiencing a heart attack, as emotionally traumatic as they are, do not meet the psychiatric criteria for trauma sufficient to trigger a potential valid diagnosis of PTSD. (*Id*.). By definition, if someone does not experience a requisite trauma, they cannot have PTSD regardless of the symptoms or duration of symptoms they have. (*Id*. ¶ 10).

2. Plaintiff did not have PTSD.

In this case, all of the relevant interaction on June 24, 2020 was captured on video, albeit without sound. (Bello Dep. p. 138) (Ex. C). A review of the recordings, even without the sound, paints a clear picture of what happened. (Singer Dec. ¶ 11).

In video one, Saumell approached Plaintiff angry and frustrated, but clearly posed no physical threat to Plaintiff. (*Id*. ¶ 12). After Saumell left the room, Plaintiff removed the ticket from his wallet, showing his colleagues that he had lied to their supervisor, and hid the ticket. (*Id*.). Plaintiff is seen on the video clearly laughing and kidding with his colleagues. (*Id*.). There was no indicia that Plaintiff experienced anything that could be considered a medically significant trauma. (*Id*.).

In the second video, Saumell appears to briefly call Plaintiff over. (*Id*. ¶ 13). Plaintiff, still drinking his smoothie, casually walks toward Saumell. (*Id*.). Saumell appears upset, gesturing at

Plaintiff. (*Id.*). Saumell steps toward Plaintiff while continuing to gesticulate. (*Id.*). Within a few seconds, Plaintiff walks away, still drinking his smoothie. (*Id.*). Unpleasant as the interaction appeared to be, it clearly is not what would be considered a medically significant trauma. (*Id.*). There is no threat to his physical integrity or his life. (*Id.*).

In the third video, Plaintiff approached Saumell while accompanied by two individuals. (*Id.* ¶ 14). Saumell puts up his arm, appearing to try to keep distance from Plaintiff. (*Id.*). Words are exchanged, at which point Saumell begins to walk away. (*Id.*). Plaintiff appears to say something to Saumell, after which Saumell turns back toward Plaintiff, pointing his finger. (*Id.*). Station Manager Greg Riggin quickly steps between the two men and escorts Saumell away. (*Id.*). Plaintiff leaves the scene as well but walks back in the same direction where Saumell left. (*Id.*). Again, there is nothing in the video that comes close to the level of trauma necessary to be eligible for the diagnosis of PTSD (even if followed by symptoms). (*Id.*).

These three brief interactions do not get anywhere near the level of acute and imminent threat to physical safety (serious harm or sexual violence) as given in the examples by the DSM-V for traumatic events sufficiently severe to qualify for PTSD. (*Id.* ¶ 15). A series of brief unpleasant or hostile discussions is not considered a medically significant trauma. (*Id.*). By definition, Plaintiff cannot have PTSD from these occurrences. (*Id.*)

Moreover, the events in question occurred on June 24, 2020. PTSD cannot be diagnosed unless a victim suffers a severe enough trauma and experiences requisite symptomology for at least thirty days. (*Id.* ¶ 16). Even if the first two criteria for PTSD had been met, which they were not, there is no way that Plaintiff could have had PTSD at the time DHL terminated him on July 1, 2020. (*Id.*). Similarly, CNP Penna's June 29, 2020, diagnosis of PTSD (which he has since

retracted) could not have been accurate. (*Id*.). Also, Dr. Borrego's July 7, 2020, PTSD diagnosis 13 days after the verbal disputes could not have been accurate. (*Id*.).

Plaintiff did not and has never had PTSD. (*Id*. ¶ 17). Any contrary opinions are *per se* incorrect based on authoritatively accepted standards. (*Id*.).

### 3. Dr. Borrego's Opinion and Basis

Plaintiff has not disclosed Dr. Borrego as an expert, nor provided an expert report listing and substantiating Dr. Borrego's opinions. However, Dr. Borrego gave a deposition on March 28, 2023, in her capacity as one of Plaintiff's treaters. She has been a licensed physician since 1994 and is not Board Certified. (Dr. Borrego Dep. at p. 9) (Ex. D). Dr. Borrego treated Plaintiff periodically between December 2017 through March 2022 (*Id.* at p. 4). Dr. Borrego performed pharmacal therapy, another term for medication management. (*Id*. at p. 7). For such patients, Dr. Borrego treats patients in 15-minute time slots. (*Id*. at p. 8).

Dr. Borrego agrees that the DSM-V and all prior iterations thereof is authoritative in the field of psychiatry. (*Id*. at pp. 10-11). Dr. Borrego also agrees that in order to be eligible for a potential PTSD diagnosis, a patient must suffer a sufficiently traumatic event. (*Id*. at p. 31).

From here, Dr. Borrego's views veer drastically from accepted scientific principles as to the diagnosis of PTSD. For starters, she estimates that 30% of her patients have PTSD. (*Id*. at p. 24). As to evaluating the severity of a trauma, Dr. Borrego believes that it hinges entirely on the patient's **subjective interpretation** of events. (*Id*. at 38-40) (emphasis added). She reviewed the three workplace videos. She saw how none of the three included any physical contact, none of the three lasted more than a few seconds, and how multiple witnesses were present for all interactions. Yet, when determining whether these verbal spats could be a trauma sufficient to trigger PTSD, Dr. Borrego believes it only matters how Plaintiff perceived them. (*Id*. at 38-40).

This is exactly with the DSM-V forbids. An individual's subjective interpretation of an event alone is insufficient if the event is not objectively severe enough. (Singer Decl. ¶ 20). Exposure to trauma—as defined in the DSM-V (not by subjective interpretation)—is the absolute foundation and necessary prerequisite for the diagnosis of PTSD. (*Id*.). Dr. Borrego ignored these requirements and determined that interactions were sufficiently "traumatic" purely on Plaintiff's subjective perception. (*Id*.).

Dr. Borrego also disregarded the requirement that a patient be symptomatic for 30 days prior to being properly diagnosed with PTSD. She acknowledged that the "trauma" occurred on June 24, 2020. (Borrego Dep. at pp. 39-41). She further acknowledged that her July 7, 2020 diagnosis was 13 days removed from the incident. (*Id*. at 40). She acknowledged further still that ARNP Bembibre, who treated Plaintiff on July 1 and assessed him with a PHQ9 score of 0 of 27, is "very competent." (*Id*. at 44). Still, 13 days after the incident and six days after Plaintiff exhibited no depressive symptoms whatsoever, Dr. Borrego diagnosed Plaintiff with PTSD. (*Id*. at 25).

When questioned about how she could diagnose PTSD 13 days post-incident, Dr. Borrego's methodology unraveled:

> Q. The duration of the disturbance and the disturbance being described as symptoms is more than one month, that is what is necessary to have PTSD, correct?
>
> (Objection).
>
> A. According to the DSM-3, yes. But **according to my criteria and my experience**, you know, you can have the symptoms right after or, you know, before -- or before or, you know, right after.
>
> Q. Do you have any authoritative treatise that you rely on that –
>
> A. Yes.

Q. Let me finish my question, Doctor. Do you have any other authoritative treatise that you rely on for the opinion that you can develop PTSD with symptoms of less than 30 days?

A. **You can ask my colleagues. I have 20 more years of experience. Okay. And – again, that's my answer.**

Q. So the answer is –

A. You don't have to – okay. Sorry.

Q. My question is are there any other authoritative treatise[s] that says PTSD can occur with less than 30 days of symptoms?

A. No.

(*Id*. at 42-43) (emphasis added).

If the Court has any questions about how Dr. Borrego believes 30% of her patients have PTSD, she made it clear in these two sections of testimony. She believes a qualifying trauma is anything that a patient perceives as traumatic no matter how inexplicable that perception. She further believes that any display of requisite symptomology following the trauma, even if just a day or two later, means you have PTSD. After acknowledging the DSM-V as authoritative, Dr. Borrego disregards it in two critical ways. She has no authoritative support of her beliefs and acknowledges that her departure from authoritative criteria is based on nothing but "my criteria and my experience." This is junk science personified.

### III. Legal Discussion

#### A. Expert Opinion Admissibility

Federal Rule of Evidence 702 says that expert opinions in technical areas are admissible "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably

to the facts of the case." The Advisory Committee Notes to the 2000 Amendments to Rule 702 state:

> The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.

The Advisory Committee Notes make clear that a District Court should exclude expert testimony where (1) the principles and methods used by the expert are not reliable; (2) the principles are not properly applied to the facts of the case; and (3) where the expert reaches a conclusion that the other experts in the field would not reach applying the generally accepted professional standards in that area of study. Concerning these requirements, the Advisory Committee Notes state:

> The Court in *Daubert* declared that the "focus, of course, must be solely on principles and methodology, not the conclusions they generate. *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. at 595 (1993). Yet, as the Court later recognized, "conclusions and methodology are not entirely distinct from one another." *General Electric v. Joiner*, 522 U.S. 136, 146 (1997). Under the amendment, as under *Daubert*, when an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied. *See Lust v. Merrell Down Pharmaceuticals, Inc.*, 89 F. 3d 594, 598 (9th Cir. 1996). The amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. As the court noted in *In re Paoli R.R. Yard PCB Litigation*, 35 F. 3d 717, 745 (3d Cir. 1994), "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."

The Advisory Committee Notes additionally state: "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned and not speculative before it can be admitted."

In order for an expert opinion to be admissible, there must be a direct and logical connection between the existing data and the expert's opinion. In *Joiner*, the U.S. Supreme Court stated, "[b]ut nothing in *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Expanding on this holding, the U.S. Court of Appeals for the Eleventh Circuit stated in *Cook v. Sheriff of Monroe County*, 402 F. 3d 1092 (11th Cir.):

> Moreover, nothing in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. *Michigan Millers Mut. Ins. Corp. v. Benfield*, 140 F. 3d 915, 921 (11th Cir. 1998) (quoting *Joiner*, 522 U.S. at 146). A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Joiner*, 522 U.S. at 146 (holding that the trial court did not abuse its discretion in excluding testimony on that basis). Thus, a trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained. *U.S. v. Frazier*, 387 F. 3d 1244, 1266 (finding no abuse of discretion when the trial court concluded that an "imprecise and unspecific" expert opinion would not assist the jury, and observing that the expert's imprecise opinion easily could serve to confuse the jury, and might well have misled it); *see also Id.* at 1263 ("Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403 . . . Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").

In sum, to be admissible expert opinion testimony may not be speculative or conclusory. *See Wilson v. Taser Int'l, Inc.*, 2008 WL 5215991, *6 (11th Cir. Dec. 16, 2008). In order to be admissible, the expert's opinion must be based on "hard data arrived at by unassailable methods." *Rink v. Cheminova, Inc.*, 400 F. 3d 1286, 1293 (11th Cir.); *Finnestone v. Florida Power and Light Co.*, 272 Fed. Appx. 761, 768 (11th Cir. 2008).

**B.     Dr. Borrego's Opinion that Plaintiff Had PTSD is Inadmissible**

As explained in detail above and in the Declaration of Board Certified Psychiatrist Allen Singer, M.D., the opinion testimony of Plaintiff's treating physician Dr. Priscilla Borrego fails to take into account the accepted body of learning in the field of psychiatric medicine.

Dr. Borrego agrees that the DSM-V is authoritative in the field of psychiatric medicine. Unfortunately, she willfully ignores it as it pertains to the diagnosis of PTSD.  Her first "tell" is in testifying that she diagnoses approximately 30% of her clientele with PTSD.  PTSD is an inherently rare condition because of the initial requirement of experiencing extreme trauma.  It is statistically impracticable for Dr. Borrego to have enough clients who have experienced such rare trauma, much less the requisite severe symptomology and 30 days of symptoms.

As to her specific diagnosis of Plaintiff, Dr. Borrego was shown the three videos of Plaintiff's interactions with Saumell.  Despite there being no physical component nor any realistic threat of a physical component, Dr. Borrego ignored the objectively severe requirements of the DSM-V in evaluating an alleged "trauma."  In her view, no matter how minor an incident, if a patient is subjectively stressed from it, it can trigger PTSD.  She also blatantly disregards the requirement that a patient experience symptoms for 30 days before s/he is eligible for a PTSD diagnosis.  Dr. Borrego treated Plaintiff July 7, 2020, 13 days after the interactions with Saumell. By definition, a patient cannot have PTSD 13 days after a traumatic event.

Dr. Borrego's methodology disregards the universally acknowledged authoritative criteria for the diagnosis of PTSD.  Pursuant to its mandated gatekeeping function, the Court should not permit the jury to hear Dr. Borrego's untenable position that Plaintiff had PTSD.

### C. Since Dr. Borrego Has Not Been Disclosed as an Expert, the Court at Minimum Should Limit Her Opinions to Those Held as of the Dates of Her Treatment

Even if Dr. Borrego is permitted to testify about her PTSD diagnosis, she made it on July 7, 2020, after DHL terminated Plaintiff. Plaintiff has not identified Dr. Borrego as an expert or a rebuttal expert. Plaintiff has not provided a report from Dr. Borrego pursuant to Federal Rule of Civil Procedure 26(a)(2) listing her opinions and her bases for same. Accordingly, Dr. Borrego can testify to her treatment and her diagnosis, but cannot offer an opinion beyond her treatment, such as an opinion that Plaintiff had PTSD prior to the day she diagnosed him. *Worley v. Carnival Corp.*, 2023 WL 1840107, *7-8 (S.D. Fla. Jan. 27, 2023) (Absent compliance with disclosure requirements, treating physicians limited to testifying to facts observed during treatment); *see also Kessler v. NCL (Bahamas) Ltd.*, 2020 WL 10459594, *1 (S.D. Fla. Sep. 30, 2020) (absent proper disclosure including a report, treating physicians may testify only as to what they observe during the course of their treatment; they may not venture into testimony of an expert nature) (J. Gayles); *see also Torres v. Walmart Stores East, L.P.*, 2017 WL 8780915, *2 (S.D. Fla. Jun. 9, 2017).

Dr. Borrego should not be permitted to testify that Plaintiff had PTSD at any time because her methodology is woefully flawed. However, even if the Court disagrees, her opinion must be confined to her treatment on July 7, 2020, because she did not provide a report substantiating expert opinions. She cannot testify to Plaintiff's condition prior to his termination, nor can she testify to her disagreement with ARNP Bembibre's July 1, 2020, PHQ9 findings when she was not present for the examination.

Case No.: 22-cv-23005-DPG

## IV.  Conclusion

Based on the foregoing, the Court should grant this motion and preclude Dr. Borrego from testifying that Plaintiff had PTSD based on her flawed methodology in applying accepted standards relating to the diagnosis of PTSD.  Alternatively, at minimum, Dr. Borrego's opinion must be limited to what she viewed as of the date(s) of her treatment.  She cannot provide expert opinions because she was not disclosed as an expert nor did she provide a report.

Respectfully submitted,

**CLARKE SILVERGLATE, P.A.**
5301 Blue Lagoon Drive, Suite 900
Miami, FL 33126
Telephone: (305) 377-0700
Facsimile:  (305) 377-3001

By: /s/ *Craig Salner*
    Craig Salner
    Florida Bar No. 669695
    csalner@cspalaw.com
    smunguia@cspalaw.com
    socd@cspalaw.com
    Maria J. Londono, Esq.
    Florida Bar No. 1011034
    mlondono@cspalaw.com
    jsantana@cspalaw.com

    *Counsel for Defendant DHL Express (USA), Inc.*

Case No.: 22-cv-23005-DPG

# CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed on July 7, 2023, with the Clerk of Court using the CM/ECF system, which will send e-filing notices to all counsel of record identified below:

| | |
|---|---|
| Henry Hernandez, Esq. | Monica Espino, Esq. |
| Florida Bar No. 542601 | Florida Bar No. 834491 |
| henry@hhlawflorida.com | me@espino-law.com |
| GARCIA HERNANDEZ, P.A. | Espino Law, PL |
| 2655 S. LeJeune Road, Suite 802 | 2250 SW 3rd Ave, Ste. 400 |
| Coral Gables, Florida 33134 | Miami, FL 33129 |
| T: (305) 771-3374 | T: (305) 704-3172 |
| | |
| *Co-Counsel for Plaintiff* | *Co-Counsel for Plaintiff* |

CLARKE SILVERGLATE, P.A.

By: /s/ *Craig Salner*
        Craig Salner